UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

GERALDINE BUENAVENTURA,
as Personal Representative of the
Estate of BEN BUENAVENTURA,

       Plaintiff,

vs.

NCL (BAHAMAS) LTD.,
D-I DAVIT INTERNATIONAL, INC.,
HATECKE SERVICE USA, LLC

       Defendants.

_____/

## DEFENDANT'S MOTION TO COMPEL ARBITRATION

Defendant, NCL (BAHAMAS) LTD. ("Norwegian"), by and through undersigned counsel, moves to compel this matter to arbitration, and states:

### Background

This case must be compelled to arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention" 9 U.S.C. §§ 201–08) pursuant to the parties' binding and mandatory arbitration agreement. Plaintiff is a seafarer and a citizen of the Philippines. [Exhibit A: Collective Bargaining Agreement; Exhibit B: Employment Agreement]. Norwegian employed Plaintiff onboard its vessel as a second officer. [Exh. A]. At all material times, Plaintiff's employment with Norwegian was governed by the terms and conditions of the collective bargaining agreement executed by both Plaintiff and Norwegian. [Exh. A].

On July 20, 2016, Plaintiff participated in a lifeboat and rescue boat drill onboard the *Norwegian Breakaway*. During the drills, Plaintiff was injured and transported to a hospital. On August 27, 2016, Plaintiff died allegedly due to injuries sustained during the lifeboat drills.

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

Plaintiff's wife, Geraldine Buenaventura, brought suit against Norwegian, which must now be submitted to arbitration.

The Collective Bargaining Agreement contains mandatory foreign arbitration clauses. The clauses, command, in part:

> Any and all claims, grievances and disputes of any kind whatsoever between the Unions and/or the Seafarer, on one side and Norwegian and/or the Master and/or the Employer and/or the Ship Owner and/or the Vessel and/or Vessel Operator on the other side which arise from, are in any way related to or are in connection with the Seafarer's shipboard employment with Norwegian shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards (new York 1958)("The Convention"), except as otherwise provided in any government mandated contract, such as the Standard POEA Contract for Seafarers from the Philippines.

[Exh. A, Art. 29(C)(6)(a)]. Regarding Filipino Seafarers, the Seafarer's Agreement states:

> Jurisdiction and venue over employment disputes between Filipino Seafarers and Norwegian shall be governed by the terms of the Standard Philippine Overseas Employment Administration Contract of Employment ("POEA Contract") and the POEA Contract jurisdictional and venue terms shall supersede and take precedence over any conflicting terms set forth in the Agreement.

[Exh. A, Art. 30, ¶ 4].

The Plaintiff's employment agreement incorporates the POEA's "Governing Board Resolution No. 9 and Memorandum Circular No. 10, both Series of 2010" by reference. [ECF No. 1-1 p. 1 pp. 2]. The POEA states that "the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of voluntary arbitrators." [Memorandum Circular 10 sec. 29].

## **Memorandum of Law**

This Court must compel this case to arbitration pursuant to the Convention. Arbitration agreements are favored and rigorously enforced by courts. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

473 U.S. 614, 625 (1985). A court has little discretion in deciding whether to enforce a valid arbitration agreement. *Bautista v. Star Cruises*, 396 F.3d 1289 (11th Cir. 2005). Arbitration agreements concerning foreign commerce are given particular deference. *Mitsubishi Motors*, 473 U.S. at 629. Any doubts concerning the scope of arbitration should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983).

Foreign seaman arbitration agreements, just like this one, are universally enforced by this Court and the Eleventh Circuit pursuant to the Convention. *E.g.*, *Bautista*, 396 F.3d at 1289; *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257 (11th Cir. 2011); *Maxwell v. NCL (Bahamas) Ltd.*, 454 F. App'x 709 (11th Cir. 2011); *Azavedo v. Royal Caribbean Cruises, Ltd.*, 4 F. Supp. 3d 1357 (S.D. Fla. 2014); *Tancu v. Celebrity Cruises, Inc.*, 2010 WL 271432 (S.D. Fla. Jan. 15, 2010); *see also Moncada v. Norwegian Corp.*, 13-cv-23779-CMA [ECF No. 4] (S.D. Fla. Oct. 18, 2013). In deciding whether to compel arbitration under the Convention, this Court must conduct a very limited inquiry, which is set forth in the Eleventh Circuit's seminal case of *Bautista,* which also involved a Filipino seafarer and the POEA. *See Bautista*, 396 F.3d at 1294. Under *Bautista,* a district court must order arbitration unless (1) the four jurisdictional prerequisites are not met, or (2) one of the Convention's affirmative defenses applies. *Id*.

The four jurisdictional prerequisites are: (1) there is an agreement in writing to arbitrate the dispute; (2) the agreement provides for arbitration in the territory of a signatory to the Convention; (3) the agreement to arbitrate arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen. *Id*. This Court has jurisdiction to enforce the arbitration agreement here as all four prerequisites are met. The arbitration agreements are in writing—the Seafarer's Agreement; the arbitration agreements provide for arbitration in the Philippines, a signatory to the Convention; the arbitration agreements arise out of a commercial,

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

legal relationship, *Bautista*, 396 F.3d at 1300; and Plaintiff is not a United States citizen. This case must be compelled to arbitration.

None of the Convention's affirmative defenses to arbitration apply either. A party may only avoid arbitration under the Convention where "said agreement is null and void, inoperative or incapable of being performed." *Lindo*, 652 F.3d at 1263. The affirmative defenses are confined to "standard breach-of-contract defenses" such as fraud, mistake, duress, and waiver "that can be applied neutrally on an international scale." *Id*. Public policy or unconscionability arguments are not valid affirmative defenses to prevent the enforcement of an arbitration agreement under the Convention. *Id*. at 1280. Plaintiff has no valid affirmative defense to arbitration in this case.

Furthermore, Norwegian did not waive arbitration, as Plaintiff alleged in the Complaint. "Waiver occurs where a party 'substantially participates in litigation to a point inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party.'" *Hodgson v. Royal Caribbean Cruises, Ltd.,* 706 F.Supp.2d 1248, 1256 (S.D. Fla. 2009) *quoting Morewitz v. W. of Eng. Ship Owner Mut. Prot. & Indemnity Assoc. (Luxembourg),* 62 F.3d 1256, 1366 (11th Cir. 1995). In determining whether a party waived arbitration, the court is to examine "the totality of the circumstances" including "the length of delay in demanding arbitration." *Hodgson,* 706 F.Supp.2d at 1257 *quoting S & H Contractors, Inc. v. A.J. Taft Coal Co.,* 906 F.2d 1507, 1514 (11th Cir. 1990).

Here, prior to Plaintiff filing a Complaint in state court, Norwegian initiated arbitration in the Philippines requesting that the POEA address Plaintiff's anticipated prayer for damages, and requesting clarification from the POEA in light of the fact that a settlement was previously reached between Plaintiff and Norwegian. In Plaintiff's Complaint, Plaintiff attempts to color the arbitrator's decision not to rule on Norwegian's request as a decision by the arbitrator to not hear

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

the case at all. This is a mischaracterization of the arbitrator's order. [Exhibit C]. Rather, the arbitrator ruled that Norwegian's request was not ripe as a formal claim for damages had not yet been filed by Plaintiff, and so the arbitrator did not have all information available. As the order stated:

> It must be noted that the parties both admitted that there was full settlement of claims under the CBA as well as the standard contract of the POEA. What is being sought for clarification is such other claims or entitlement that may arise as a consequence of the purported gross negligence committed that led to the death of Ben Buenaventura. Certainly, such determination cannot be had on mere position papers…

[Exh. D, pp. 8, ¶4]. Thus, now that a Complaint was filed the controversy is ripe for arbitration. Norwegian has not delayed the proceedings in any way nor has it even engaged in discovery. Since Plaintiff filed a Complaint, the only action on Norwegian's part has been to remove the matter to federal court and seek arbitration.

This case still must be submitted to arbitration. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983). Further, it is well-settled that as Plaintiff has not challenged the arbitration clause itself, the case proceeds to the arbitrator to resolve issues—not the court. *See Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445-46 (2006).

In sum, this case must be compelled to arbitration under the Convention. The parties entered into valid and mandatory foreign arbitration agreement covering the all claims Plaintiff brought in this case. All jurisdictional prerequisites under the Convention have been met, and

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

none of the Convention's affirmative defenses apply. This case must be compelled to arbitration as the parties agreed.

WHEREFORE Norwegian respectfully requests that this Court compel this case to arbitration as stated herein, and grant any other relief this Court deems just and proper.

### S.D. Fla. L.R. 7.1 CERTIFICATION

I hereby certify that counsel for the movant made reasonable efforts to confer with all parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issue raised in this motion, but was unable to do so.

Respectfully submitted,

MASE MEBANE & BRIGGS, P.A.
*Attorneys for Defendant*
2601 South Bayshore Drive, Suite 800
Miami, Florida  33133
Telephone:  (305) 377-3770
Facsimile:  (305) 377-0080

By:____/s/ Adam Finkel_____
    CURTIS J. MASE
    Florida Bar No.478083
    cmase@maselaw.com
    kfehr@maselaw.com
    CAMERON W. EUBANKS
    Florida Bar No. 85865
    ceubanks@maselaw.com
    rcoakley@maselaw.com
    ADAM FINKEL
    Florida Bar No. 101505
    afinkel@maselaw.com
    filing@maselaw.com

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2018, I electronically filed the foregoing document with the Clerk to the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Adam Finkel*
ADAM FINKEL

CASE NO.: 1:18-cv-22922-MOORE/SIMONTON

## <u>SERVICE LIST</u>

Michael A. Winkleman, Esq.
Jason R. Margulies, Esq.
Lipcon, Margulies, Alsina & Winkleman, P.A.
Suite 1776, One Biscayne Tower
2 South Biscayne Blvd.
Miami, Florida  33131
Tel: (305) 373-3016
Fax: (305) 373-6204
mwinkleman@lipcon.com
jmargulies@lipcon.com
Anotari@lipcon.com
*Attorneys for Plaintiff*


Jerry D. Hamilton, Esq.
Robert M. Oldershaw, Esq.
Elisha M. Sullivan, Esq.
150 S.E. 2nd Avenue, Suite 1200
Miami, Florida  33131
Tel: (305) 379-3686
Fax: (305) 379-3690
jhamilton@hamiltonmillerlaw.com
roldershaw@hamiltonmillerlaw.com
esullivan@hamiltonmillerlaw.com
gbernardez@hamiltonmillerlaw.com
spayne@hamiltonmillerlaw.com
smarroquin@hamiltonmillerlaw.com


BUENAVENTURA//#27

**MASE MEBANE & BRIGGS**

# Exhibit A

**Competent Labor Authorities in Other Countries**
See Annex 7 for a list of competent labor authorities in other countries where and if available.

and to Norwegian's Vice President of Fleet Personnel at

**NCL (Bahamas) Ltd.**
Airport Corporate Center
7665 Corporate Center Drive
Miami, Florida 33126, USA
PH: +1-305-436-4456,
FX: +1-305-436-4138
EM: FPGrievance@ncl.com

Within ninety (90) days of receipt of such notice, the representatives of the Union(s) and Norwegian shall confer to resolve the dispute. Upon request the parties will as soon as possible produce to each other all non-privileged documents and information available relevant to the dispute, including but not limited to the any statement by the Seafarer taken by Norwegian, Disciplinary Committee documents, medical records, and pertinent personnel files. The Seafarer shall receive notification within ninety (90) days after the decision.

2. The parties shall investigate whether the On Board Complaint Procedures set forth above were followed and shall encourage that such procedures be exhausted unless the particular circumstances of the case prevent it.

3. All shoreside complaint procedures followed in addressing the complaint and the decision concerning the complaint shall be set forth in a written document, and a copy of the document shall be provided to the Seafarer.

4. The decision of the Master shall govern until the claim or grievance is resolved by representatives of the Union(s) and Norwegian. If the Seafarer is continuing to serve in his/her assigned capacity during the resolution process, he/she shall continue to peacefully and satisfactorily perform his/her duties, and the parties shall faithfully observe this Agreement while the grievance, complaint or dispute is being resolved.

6. Arbitration:

   a. Any and all claims, grievances and disputes of any kind whatsoever between the Unions and/or the Seafarer, on one side and Norwegian and/or the Master and/or the Employer and/or the Ship Owner and/or the Vessel and/or Vessel Operator on the other side which arise from, are in any way related to or are in connection with the Seafarer's shipboard employment with Norwegian shall be referred to and resolved exclusively by binding arbitration pursuant to the United Nations Convention on Recognition and Enforcement of Foreign

Arbitral Awards (New York 1958)("The Convention"), except as otherwise provided in any government mandated contract, such as the Standard POEA Contract for Seafarers from the Philippines.  In addition, the Unions, Seafarer, and Norwegian agree that the Arbitrator shall have exclusive authority to resolve any claims, grievances, and, disputes such as the interpretation, procedures, location, applicable law, validity and enforceability of the arbitration provision of this Agreement.

b.   The arbitration shall be administered by the International Centre for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA") under its International Dispute Resolution Procedures.  The initiating party shall file a written notice of its intention to arbitrate by forwarding a demand for arbitration ("Demand") to Norwegian and Norwegian's registered agent via certified mail.  The Demand shall identify each party to the case, the initiating party's representative(s), and shall include a description of the nature of the claim, the estimated amount in controversy and the relief and/or damages sought. Norwegian, the Seafarer, or the Unions may initiate arbitration by filing a Demand with the ICDR at http://www.icdr.org.

c.   Arbitration between the Union(s) and Norwegian, or between a Seafarer and Norwegian and not involving the Union(s) as a party, shall take place in Miami, Florida unless Seafarer has been denied a visa for entry into the United States after all available efforts have been exhausted and in which case the arbitration shall take place in Nassau, Bahamas.  In the event Seafarer is unable to obtain a visa for entry into Nassau, Bahamas after all available efforts have been exhausted, then the arbitration shall take place in the Seafarer's country of citizenship, if such country has ratified the Convention. In the event Miami, Florida, Nassau, Bahamas and the Seafarer's home country are unavailable for the arbitration to take place, then the arbitrator shall determine the location.

d.   The Arbitrator is to be jointly appointed by the Union(s) and/or the Seafarer, on one side, and Norwegian, on the other side, unless the parties cannot agree to an Arbitrator, in which case the AAA shall select the Arbitrator from among six names, three submitted by the Union(s) or the Seafarer and three submitted by Norwegian.  The parties shall have the right in the arbitration to conduct depositions under oath of parties and witnesses however depositions shall be limited to a maximum of three (3) per party and shall be limited to a maximum of seven (7) hours in duration each.  Additional depositions may be scheduled only with the permission of the Arbitrator for good cause shown.  The parties are entitled to medical examination(s) to verify any injuries or damages claimed, or to rebut any defenses.  To maintain the impartiality of the examination, neither party's attorney, agent, nor representative shall be present during Norwegian's examination.  The parties will exchange all documentation to be relied

upon at the final arbitration hearing in accordance with the International Dispute Resolution Procedures of the ICDR.

e.   In the event a dispute between the Union(s) and Norwegian, or between Norwegian and a Seafarer, cannot be resolved through good faith negotiations and either party commences an arbitration proceeding, Norwegian shall bear the reasonable costs related to the arbitration process from beginning to end including, but not limited to fees charged and expenses incurred by arbitrators, and any costs related to proceedings necessary to enforce a decision regardless of who represents the Seafarer. Each party shall bear the costs of their own attorney fees and legal representation.

f.   If the Seafarer rejects the representation appointed by the Union(s) at arbitration or thereafter, or if he or she initiates arbitration independently, then he or she will cover the cost of his or her own legal representation, if any. If the Seafarer is not represented by the Union(s), and where the Arbitrator is in doubt, the Arbitrator should seek the Union(s)' opinion as to the intent of the applicable provision at issue in the Agreement before making a decision. If the Arbitrator makes a decision after seeking the Union(s)' opinion, the Union(s) shall be informed of the Arbitrator's decision.

g.   Norwegian, the Union(s), and the Seafarer also acknowledge that they voluntarily and knowingly waive any right they have to a jury trial. The arbitration referred to in this Article is exclusive and mandatory. Lawsuits or other proceedings between any Seafarer and/or the Union(s) and Norwegian may not be brought except to enforce the arbitration provision of this Agreement or to enforce a decision of the Arbitrator. The Arbitrator may award reasonable attorneys' fees and expenses to the prevailing party if allowed by statute or applicable law.

h.   If the dispute is one involving the amount of wages owed or paid to the Seafarer, the parties agree that Norwegian shall have the right, without incurring any further liability, within sixty (60) days of Norwegian's Vice President of Fleet Personnel receiving the written notice described in Article 29.5.C.1 from the Seafarer of the dispute or complaint and dissatisfaction with the Master's decision, to either pay the amount claimed by the Seafarer or to commence an arbitration to resolve the claim and deposit the amount claimed into an interest-bearing account pending a legal determination of whether the claim has merit.  In the event Norwegian deposits the claimed amount as provided herein, the parties agree that the sole amount to be paid to the Seafarer if his/her claim if determined to be meritorious will be the amount claimed plus any accrued interest.

i.   The Seafarer shall continue to satisfactorily and in good faith perform his/her duties and the parties shall abide by this Agreement while disputes or grievances are being resolved.

# Exhibit B

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION
CONTRACT OF EMPLOYMENT

KNOWN ALL MEN BY THESE PRESENTS:

This Contract, entered into voluntarily by and between:

Name of Seafarer :  **BUENAVENTURA, BEN MARONILLA**

Date of Birth :  **25.03.1975**    Age :  **40**   Place of Birth :  **CAMARINES SUR**

Address :  **SITIO LIBU VILLA SANTIAGO BRGY. BALAYONG MALOLOS BULACAN**

SIRB No. : **C0131229**    SRC No. :  **0081135-93**
License No. :
hereinafter referred to as the Employee, and
Name of Agent :  **C.F. SHARP CREW MANAGEMENT, INC.**

Address of Agent :  **CASA ROCHA 290-292 GENERAL LUNA ST. INTRAMUROS, MANILA.**

For and in behalf of        **NORWEGIAN CRUISE LINE, LTD.**
**7665 CORPORATE CENTER DRIVE, MIAMI FLORIDA, USA 33126**
(Principal/Country)

For the Vessel :    **M/S NORWEGIAN BREAKAWAY (HOTEL)**

IMO No. :  **9606912**    Gross Registered Tonnage (GRT) :  **143000**    Flag :  **BAHAMAS**

Official No. : **9000381**    Year Built :  **2013**    Vessel Type : **PASSENGER / CRUISE SHIP**

CBA Affiliation. :  **NSU CBA**    Classification Society :  **DNV**
hereinafter referred to as the Employer.

WITNESSETH

1.  That the employee shall be employed onboard under the following terms and conditions

| | | |
|---|---|---|
| 1.1 Duration of Contract | **8.00** | months |
| 1.2 Position | **WAITER /TRESS ***  | Group: C2 |
| 1.3 Basic | $   **575.00** | per month |
| 1.4 FOT | $   **0.00** | (40-56 Hours) |
| 1.5 GTD O/T Pay | **540.10** | per month for 60.62 Hours |
| 1.6 Vacation Pay | $   **86.25** | per month |
| 1.7 Monthly GTD Pay | **0.00** | per month (Inclusive compensation for unlimited hours of work) |
| 1.8 Monthly Incentive | $   **635.00** | per month |
| 1.9 GTD  O/T Rate | $   **4.15** | |
| 1.10 Hourly OT Rate | $   **4.99** | per hour in excess of GOT |
| 1.11 Seniority Pay | **0.00** | per month    First Hire Date:    **July 14, 1999** |
| **1.12 Total Monthly Pay to Seafarer** | $   **1,836.35** | per month |
| 1.13 Union Fee | $   **15.00** | **(Directly remitted to Union)** |
| 1.14 Social Program Compensation | $   **25.00** | **(Directly remitted to SSS and Philhealth)** |
| 1.15 Special Monthly Incentive | $   **0.00** | |
| 1.16 Additional Incentive | $   **0.00** | |
| 1.17 Leave Days | **4.5** | day(s) |
| 1.18 POINT OF HIRE | **MANILA** | |

2.  The herein terms and conditions in accordance with Governing Board Resolution No. 9 and Memorandum Circular No. 10, both Series of  2010, shall be strictly and faithfully observed.

3.  The shipowner shall provide decent working and living conditions onboard the ship. Likewise, the health and social security protection benefits shall also be provided to the seafarer.

4.  Any alterations or changes, in any part of this Contract shall be evaluated, verified, processed, and approved by the Philippine Overseas Employment Administration (POEA).  Upon approval, the same shall be deemed an integral part of the Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going

5.  Violations of the terms and conditions of this Contract with its approved addendum shall be ground for disciplinary action against the erring party.

IN WITNESS WHEREOF, the parties have hereto set their hands this **14 of March 2016** at Manila, Philippines.

_____
**BUENAVENTURA, BEN  MARONILLA**
Seafarer

_____
**JICKIE P. ILAGAN**
**For the Employer**

Verified and approved by the POEA

03 / 15 / 2016

## ADDENDUM TO EMPLOYMENT CONTRACT

**C.F. Sharp Crew Management, Inc.**,  a seabased manning agency registered under the Philippine Overseas Employment Administration (POEA) herein referred to as the **FIRST PARTY**;

and

**BEN  M.  BUENAVENTURA**, joining the vessel **M/S NORWEGIAN BREAKAWAY (HOTEL)** in the capacity of **WAITER /TRESS \*** position with seaman's book no **C0131229** herein referred to as the **SECOND PARTY**;

Both parties hereby agreed to the following undertakings:

1. That it was explained that the vessel where the **SECOND PARTY** is assigned may transit through the "High Risk Areas" during the term of contract;

2. That in the event the vessel of the **SECOND PARTY** will transit in "High Risk Areas", POEA Governing Board Resolution No. 26, Series of 2014, will apply; to be explained in details by the **FIRST PARTY:**
3. That the **FIRST PARTY** will faithfully observe the provisions of the said POEA Governing Board Resolution No. 26, Series of 2014 to protect the interests of the **SECOND PARTY**;

4. That the **SECOND PARTY** will honor the provisions of the said POEA Governing Board Resolution No. 26, Series of 2014 as part of his contractual obligations with the **FIRST PARTY**.

Both parties hereby express their conformity to this Addendum to the Employment Contract by affixing their signatures below.

**FIRST PARTY**                                               **SECOND PARTY**

**JICKIE P. ILAGAN**                                        **BEN  M.  BUENAVENTURA**
Fleet Manager                                               WAITER /TRESS *

**POEA**

PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION
PRE-EMPLOYMENT SERVICES OFFICE
SEABASED EMPLOYMENT ACCREDITATION AND PROCESSING CENTER
**APPROVED**

YOLANDA E. PARAGUA
Director II - SEAPC

Date:  March 18, 2013



# Exhibit C

REPUBLIC OF THE PHILIPPINES
DEPARTMENT OF LABOR AND EMPLOYMENT
**NATIONAL CONCILIATION AND MEDIATION BOARD**
**NATIONAL CAPITAL REGION**
**OFFICE OF THE VOLUNTARY ARBITRATOR**
Ground Floor, DOLE Building, Intramuros, Manila

**C.F.     SHARP     CREW**
**MANAGEMENT,     INC.,     and**
**NORWEGIAN CRUISE LINE, LTD.,**
*Complainants,*

-versus-                  **MVA-090-RCMB-NCR-005-01-01-2017**

**HEIRS OF BEN BUENAVENTURA**
**as represented by GERALDINE**
**BUENAVENTURA,**
*Respondent.*
x------------------------------------------x

# DECISION

This resolves the complaint filed by **C.F. SHARP CREW MANAGEMENT, INC., and NORWEGIAN CRUISE LINE, LTD.** ("Complainant" for brevity) against the **HEIRS OF BEN BUENAVENTURA as represented by GERALDINE BUENAVENTURA** ("Respondent" for brevity) concerning the invocation of the jurisdiction of this Board  to determine the respective rights and obligations of the parties in relation to the collective bargaining agreement, employment contract and other claims arising therefrom.

As culled from the records,   Complainant alleged the following relevant facts, to wit:

"On 14 March 2016, Mr. Ben M. Buenaventura [hereinafter "seafarer", "deceased seafarer" of husband seafarer"] entered into an 8-month contract with complainant C.F. Sharp Crew Management Inc. [hereinfter "CF Sharp"], for and in behalf of its principal, complainant Norwegian Cruise Line Ltd. [hereinafter "NCL"].

"Seafarer's employment contract was governed by the POEA SEC and the CBA. [See **Annexes "1" and "2"** above]

1

"Seafarer joined the cruise ship on 7 May 2016 and worked on board as Waiter.

"On 26 May 2016, seafarer was informed about undergoing Rescue Boat Training. [Training Notification Form is hereto attached as **Annex "4"**] Lifeboat Drills and Training is conducted every month. [Drills and Training Record Sheet is hereto attached as **Annex "5"**]

"On 20 July 2016, seafarer suffered injuries during the conduct of lifeboat drill. Seafarer was immediately brought down to the ship's infirmary and eventually brought to Bermuda Hospital in Miami, Florida, USA. [Medical Report dated 20 July 2016 issued by Dr. Eduardo Gabutero is hereto attached as **Annex "6"**]

"Medical progress Reports printed between 1 August to 22 August 2016 issued by the team of specialists which attended to seafarer (surgeon, nephrologist, Gastro-interologist, pharmacist, neuro-surgeon and general doctor) are hereto attached as **Annex "7" and series".**

"While seafarer was treated in US, complainants sent for his mother (Elizabeth) as well as son (Brenzid Lawrence) and arranged their visas and travel from the philippines to Miami, Florida. All expenses were paid by complainants. Respondent wife, also a seafarer was already in the US and was at that time employed on board the same cruise ship.

"In 27 August 2016, seafarer met his untimely demise and his remains were repatriated on 15 September 2016.

"While seafarer was still alive, respondent wife already claimed for her husband seafarer's benefits under the employment contract.

"On 9 September 2016, herein complainants filed a Notice to Arbitrate to discuss deceased seafarer's death benefits under the employment contract.

"Meanwhile, the wife hired lawyers in the US Messrs. Lipcon, Margulies, Alsina & Winkleman, P.A. Settlement discussions ensued between NCL and the lawyers of the wife while arbitration proceedings was going on before the NCMB.

"On 2 November 2016, the wife through counsels entered into a settlement agreement [See **Annex "3"** above] and received the total amount of US$110,000.00 as full death benefits under the CBA. The payment of US$110,000.00 is computed as follows in accordance with Article 20 [see page 15 of **Annex "2"** above] in reference to Annex 6 thereof [see page 16 of **Annex "2"** above]

2

| | |
|---|---|
| "Death Benefits | USS 90,000.00 |
| "Additional Compensation | |
| For (1) minor child | USS 20,000.00 |
| | -------------------- |
| | USS 110,000.00 |
| | ============== |

"Respondent wife however is claiming for additional compensation despite and inspite the settlement concluded on 2 November 2016."

On the part of the respondent, she alleged the following facts, to wit:

"3.    Ben was first hired by Complainants on July 14, 1999 and had since then regularly renewed his contract. His last contract with Complainants was as a Waiter on board M/V Norwegian Breakaway for a period of eight (8) months. A copy of Ben's POEA-approved employment contract dated March 14, 2016 was attached as Annex "A" to the Complainant. His employment is also covered by a Collective Bargaining Agreement (CBA), a copy of which is attached as Annex "C" to the Complainant.

"4.    Geraldine has been regularly working with Complainants as well. At the time of the tragic incident, Geraldine was also employed as a Restaurant Hostess by Complainant and worked in the same vessel as Ben. As such, she has personally witnessed and experienced the incident which led to the injury and eventual death of her husband.

"5.    Ben was part of the Crew Drill and was in the lifeboat. During the drill, the crew inside the lifeboat did not have a safety harness. Neither was there any safety net. In fact, there were no safety mechanism in place. Thus, when the lifeboat's tethering broke, it was left hanging from one wire and the four people in the lifeboat, Ben included, fell into the water. Worse, the lifeboat fell on Ben.

"6.    As narrated by Geraldine in her handwritten letter, copy attached as **Annex " 1":**

"Noong July 20, 2016, 10:00 ng umaga ay nagsimula kami mag perform ng Crew Drill dahil mandatory ito, isang beses sa isang linggo. Ang Mandatory Crew Drill noong araw na iyon ay mas mahaba at mas matagal kumpara sa mga nakaraan at Usual Crew drill naming mga crew. Kadalasan nag-peperform kami ng may 2 o 3 lang na Emergency Code. Pero noong araw ng July 20, 2016 crew drill, ay nag announce ang barko ng halos lahat ng Emergency Code. Sa simula ng Drill, nag-announce sila ng **CODE ALPHA (medical emergency)** ang ibig

3

sabihin. Sumunod ang **Code BRAVO (Fire onboard)** ang ibig sabihin ay may sunog. Pangatlo **CODE DELTA (Damage sa Barko).** Si Ben Buenaventura ang aking asawa ay naka assign sa RESCUE BOAT, ibinaba nila ang rescue boat mula sa Deck 7. Pagkatapos po na mag announce na Clear na ang CODE Delta (Damage), inangat, ipinanik at itinaas na nila ang Rescue boat na may 4 na tao sa loob ng Bangka kasama ang aking asawa na si Ben Buenaventura. Itinaas nila sa 7th Deck ang Bangka na may laman na 4 na tao . Habang nasa itaas ng Deck 7, ang Rescue Boat nag announce ulit ng panibagong emergency code na **CODE PAPA (Pollution).** Kaya kailangan ulit nilang ibaba ang Rescue Boat sa Pangalawang Pagkakataon. At ipinanil ulit sa Deck 7. Ng matapos ang Crew Drill at nag announce na ang Crew Drill ay tapos na, itinaas muli ang rescue boat sa Deck 7 na may 4 na taong nakasakay. Sa makatuwid mahigit ilang beses nilang pinagbaba at itaas ang rescue boat Mula sa Deck 7 pababa sa tubig, at mula sa tubig papanik sa Deck 7 ng may nakasakay na apat na tao sa loob. Madalas kami mag perform ng Crew Drill, madalas din ibinababa ang mga lifeboat at rescue Boat. Ngunit hindi ito madalas napapalitan kaya malamang ang mga kable ng mga Bangka ay marurupok na.

"Ilang minuto lang makalipas ng pag-announce ng crew drill ay tapos na. Nagbalikan na ang mga crew sa kani-kaniyang trabaho. Maya-Maya pa ay nag emergency code ulit ang barko ng **CODE (OSCAR) (man over board)** ibig sabihin ay may nahulog na tao sa tubig. Ako nuon ay nasa aking cabina na, tumawag ako sa aking kasamahan upang alamin kung ang CODE OSCAR ay parte pa din ng aming CREW DRILL? Sabi sa akin ay oo. Part pa din ng crew drill, maya-maya pa, makalipas ang ilang minuto mga pasado 11:30 AM ay may tumawag na sa aking cabina ang aking Restaurant Manager.

"Sinabi sa akin huminga daw ako ng malalalim. Kinabahan na ako at sinabi nga nila sa akin na may EMERGENCY na aking asawa na si BEN M. BUENAVENTURA ay kasama sa aksidente, nahulog ang aking asawa mula sa Deck 7 sa tubig at nadaganan ng Rescue Boat. Nahulog sya mula sa Deck 7. Ikapitong palapag ng Barko. Halintulad sa isang building na may anim na palapag. Napatid ang kable ng Rescue boat habang nasa Deck 7 ito. dahilan upang mahulog ang aking asawa sa tubig.

"Tuluyan ng nakalas ang kable ng Bangka at nahulog ang Rescue Boat sa tubig. Ito ay dumagan sa aking asawa. Nadaganan ng rescue boat ang aking asawa. Tumakbo ako palabas ng barko, akala ng karamihan ng mga crew ay ang nangyari na

4

CODE OSCAR ay parte pa din ng Crew Drill, hindi nila inakala na ito ay actual na pangyayari, habang nirerescue ang aking asawa ng PRIVATE BOAT akala nila ito ay dummy. Na declare na missing ang aking asawa na si Ben Buenaventura. Sapagka't nagtagal bago sya nakita.

"Ng nakuha na si Ben sa tubig, at dinala sa ambulansya at nandoon ako. Nakakapag-salita pa ang aking asawa at sinasabi na masakit ang kanyang likod, mga binti, at tyan. Isinugod namin sya sa HOSPITAL SA BERMUDA. Bandang Pasado 12:30 na ng hapon nakarating kami sa hospital mga pasado 1:15 pm na. Sa emergency room ay conscious pa sya at nakakapagsalita dahilan upang maikwento nya sa akin ang buong pangayayari sinubukan nyang iligtas ang isa pa nyang kasamahan na si DIOGANES CARPIO ngunit itoy naiwan sa loob ng Rescue Boat, Ng tuluyan ng mapatid ang kable ng RESCUE BOAT. Nahulog na si Ben sa tubig. Isinugod din si Dioganes Carpio ngunit agad itong namatay sa dami ng pinsala sa katawan, ulo at mukha.

"7.    A police report narrating the unfortunate incident issued by the Bermuda Police Service is herein attached as **Annex "2"**.

"8.    Ben was seriously injured and suffered the following injuries:

     i.      Fracture at Scapula
     ii.     Fracture at right arm and elbow
     iii.    Blood on his brain
     iv.    Swelling on scalp
     v.     Bruising on his lungs
     vi.    Multiple Fractures on his ribs
     vii.   Abdominal bleeding
     viii.  Beeding in the liver
     ix.    Blood on the knee
     x.     Both side right and left comminuted fractures on both femur
     xi.    Multiple fracture right and left acetabular and pelvic
     xii.   Multiple fractures on spine T-12-L1 to L5

"A Complete report of the injuries sustained by Ben is provided in the Observation Detail Report issued by Bermuda Hospitals Board, attached as **Annex "3"**. Also attached are the previous picture of Ben when he was in the hospital, showing the severity of his condition.

"9.    Ben stayed in the Intensive Care Unit (ICU) of the Bermuda Hospital where surgery was performed on his fractured arm elbow and wrist. On July 24, 2016, he was

transferred to Ryder Trauma Jackson Memorial Hospital in Miami, Florida, U.S.A.

"10.   He was confined in the Trauma ICU and underwent surgery in his spine but due to the severe injuries suffered, his condition deteriorated until his demise on August 27, 2016 after forty (40) days stay in said hospital.

"11.   Geraldine witnessed all these because she was with her husband all the time - from the incident during the crew drill and during Ben's tenure in the hospital. When he was still conscious, Ben described to her how he fell from the rescue boat and the pain he went through in his entire body.

"12.   Ben's pain is tantamount to the bleeding heart of Geraldine in losing her husband and more. She was left to care for their five-year old child Brenzid who will never see his father again and cannot teach him how to play basketball. The whole harrowing experience is so traumatic that she sought help of professional psychiatrist and was advised not to work on board any so she will not relive the memories of the unfortunate incident again. Not only did she lose the love of her life, she also lost her job and a promising future for their family.

"13.   Justice and fairness demands that Geraldine's agony should be compensated by the irresponsible and heartless Complainants though no amount of money can bring back Ben and complete a happy family again. Geraldine has every right granted by law and equity to sue Complainants for their negligence.

"14.   Yet, in a weird twist and a clear sign of Complainant's bad faith, they (Complainants) initiated the instant arbitration proceedings thirteen (13) days after Ben's death, while Geraldine and the rest of the family were still shocked and grieving.

"15.   In fact, when the instant notice to arbitrate was filed before this Honorable Office on September 9, 2016, the remains of Ben have not yet even arrived in the Philippines.

"16.   There is only one logical explanation for Complainants' act they want to prevent Geraldine from instituting an action arising from their clear gorss negligence.

"17.   Indeed, compassion is stranger to Complainants even to its crew who had loyally served them through the years.

6

The parties thereafter submitted their respective replies and rejoinders which reiterated their respective claims and reliefs and other defenses.

After a meticulous and exhaustive review of the arguments of the parties, this Board finds that it has not jurisdiction over the instant complaint and thereby dismisses the same.

In their submission, the following issue was presented for resolution: "To determine the entitlements under the CBA and the POEA and other claims arising from the death of Mr. Ben Buenaventura."

The issue is akin to a declaratory relief which has been defined as an action by any person interested in a deed, will, contract or other written instrument, executive order or resolution, to determine any question of construction or validity arising from the instrument, executive order or regulation, or statute, and for a declaration of his rights and duties thereunder. The only issue that may be raised in such a petition is the question of construction or validity of the provisions in an instrument or statute.[1]

It is settled that the requisites of an action for declaratory relief are: 1] the subject matter of the controversy must be a deed, will, contract or other written instrument, statute, executive order or regulation, or ordinance; 2] the terms of said documents and the validity thereof are doubtful and require judicial construction; 3] there must have been no breach of the documents in question; 4] there must be an actual justiciable controversy or the "ripening seeds" of one between persons whose interests are adverse; 5] the issue must be ripe for judicial determination; and 6] adequate relief is not available through other means or other forms of action or proceeding.[2]

Evidently, the above requisites are not present in this case. For one, the subject matter of controversy – whether it be a document, contract or law – and the terms thereof which are doubtful and require construction have not been clarified. Once clarified, there is a likelihood that there are other

---

[1] Section 1, Rule 63 of Rules of Court
[2] Almeda v. Bathala Marketing Industries, Inc., G.R. No. 150806, January 28, 2008, 542 SCRA 470 cited in Ferrer, Jr., et al. Vs. Mayor Roco, et al., G. R. No. 174129, July 5, 2010

remedies already available to the parties, including an action wherein the relief, if proper, may be granted, beyond the bare declaration of their rights and duties.

Furthermore, the Rules provide that action of the adjudicatory body in a case such as this is discretionary. That body, "*motu proprio*, x x x may refuse to exercise the power to declare the rights and to construe instruments in any case where a decision would not terminate the uncertainty or controversy which gave rise to the action, or in any case where the declaration or construction is not necessary and proper under the circumstances." (Sec. 5, Rule 63, Rules of Court). Considering the scope of the pleadings filed by the parties, it is not likely that the case would end with a decision akin to a declaratory relief. That said, we deed it prudent to decline action in this case.

Likewise, such controversy is exclusively vested within the jurisdiction of the Regional Trial Court. This Board will be arrogating unto itself a power that is exclusively vested in another tribunal.

Assuming nonetheless that this Board can exercise jurisdiction on the basis of Article 262 of the Labor Code, as amended, the dispute does not fall within the contemplation of a labor dispute. What is being asked of this Board to rule pertains to tortious conduct of one party that would entitle the other to damages.

It must be noted that the parties both admitted that there was full settlement of claims under the CBA as well as the standard contract of the POEA. What is being sought for clarification is such other claims or entitlement that may arise as a consequence of the purported gross negligence committed that led to the death of Ben Buenaventura. Certainly, such determination cannot be had on mere position papers as the damages, including the claim of failure to exercise the required diligence must be determined by full blown trial with the court having jurisdiction over such quasi-delict. The respective claims cannot be determined by going only through the four corners of the contract as has been admitted in the respective pleadings of the parties that the there was additional claim for payment by reason of the purported negligence.

8

WHEREFORE, premises considered, the complaint filed by **C.F. SHARP CREW MANAGEMENT, INC., and NORWEGIAN CRUISE LINE, LTD.** against **HEIRS OF BEN BUENAVENTURA as represented by GERALDINE BUENAVENTURA** is hereby DISMISSED for lack of jurisdiction.

All other counterclaims are likewise DISMISSED.

SO ORDERED.

This ___30 th___ day of ___January, 2018___, City of Manila

**MVA MANUELA F. LORENZO**
Chairman

**MVA ROSARIO CRUZ**
Member

**MVA GEORGE EDUVALA**
Member

## **ATTESTATION**

I attest that the conclusions in the above Decision had been reached in consultation before the case was assigned to the writer for the opinion of the arbitrators.

**MVA MANUELA F. LORENZO**
Chairman

9