# Exhibit C

REPUBLIC OF THE PHILIPPINES
DEPARTMENT OF LABOR AND EMPLOYMENT
**NATIONAL CONCILIATION AND MEDIATION BOARD**
**NATIONAL CAPITAL REGION**
**OFFICE OF THE VOLUNTARY ARBITRATOR**
Ground Floor, DOLE Building, Intramuros, Manila

2018 FEB 26 PM 12: 56

**C.F. SHARP CREW MANAGEMENT, INC., and NORWEGIAN CRUISE LINE, LTD.,**
  Complainants,

-versus-   MVA-090-RCMB-NCR-005-01-01-2017

"NORWEGIAN BREAKAWAY"

**HEIRS OF BEN BUENAVENTURA as represented by GERALDINE BUENAVENTURA,**
  Respondent.

x------------------------------------------x

# DECISION

This resolves the complaint filed by **C.F. SHARP CREW MANAGEMENT, INC., and NORWEGIAN CRUISE LINE, LTD.** ("Complainant" for brevity) against the **HEIRS OF BEN BUENAVENTURA as represented by GERALDINE BUENAVENTURA** ("Respondent" for brevity) concerning the invocation of the jurisdiction of this Board to determine the respective rights and obligations of the parties in relation to the collective bargaining agreement, employment contract and other claims arising therefrom.

As culled from the records, Complainant alleged the following relevant facts, to wit:

> "On 14 March 2016, Mr. Ben M. Buenaventura [hereinafter "seafarer", "deceased seafarer" of husband seafarer"] entered into an 8-month contract with complainant C.F. Sharp Crew Management Inc. [hereinfter "CF Sharp"], for and in behalf of its principal, complainant Norwegian Cruise Line Ltd. [hereinafter "NCL"].
>
> "Seafarer's employment contract was governed by the POEA SEC and the CBA. [See **Annexes "1" and "2"** above]

1

"Seafarer joined the cruise ship on 7 May 2016 and worked on board as Waiter.

"On 26 May 2016, seafarer was informed about undergoing Rescue Boat Training. [Training Notification Form is hereto attached as **Annex "4"**] Lifeboat Drills and Training is conducted every month. [Drills and Training Record Sheet is hereto attached as **Annex "5"**]

"On 20 July 2016, seafarer suffered injuries during the conduct of lifeboat drill. Seafarer was immediately brought down to the ship's infirmary and eventually brought to Bermuda Hospital in Miami, Florida, USA. [Medical Report dated 20 July 2016 issued by Dr. Eduardo Gabutero is hereto attached as **Annex "6"**]

"Medical progress Reports printed between 1 August to 22 August 2016 issued by the team of specialists which attended to seafarer (surgeon, nephrologist, Gastro-interologist, pharmacist, neuro-surgeon and general doctor) are hereto attached as **Annex "7" and series".**

"While seafarer was treated in US, complainants sent for his mother (Elizabeth) as well as son (Brenzid Lawrence) and arranged their visas and travel from the philippines to Miami, Florida. All expenses were paid by complainants. Respondent wife, also a seafarer was already in the US and was at that time employed on board the same cruise ship.

"In 27 August 2016, seafarer met his untimely demise and his remains were repatriated on 15 September 2016.

"While seafarer was still alive, respondent wife already claimed for her husband seafarer's benefits under the employment contract.

"On 9 September 2016, herein complainants filed a Notice to Arbitrate to discuss deceased seafarer's death benefits under the employment contract.

"Meanwhile, the wife hired lawyers in the US Messrs. Lipcon, Margulies, Alsina & Winkleman, P.A. Settlement discussions ensued between NCL and the lawyers of the wife while arbitration proceedings was going on before the NCMB.

"On 2 November 2016, the wife through counsels entered into a settlement agreement [See **Annex "3"** above] and received the total amount of US$110,000.00 as full death benefits under the CBA. The payment of US$110,000.00 is computed as follows in accordance with Article 20 [see page 15 of **Annex "2"** above] in reference to Annex 6 thereof [see page 16 of **Annex "2"** above]

2

|  |  |
|---|---|
| "Death Benefits | US$ 90,000.00 |
| "Additional Compensation For (1) minor child | US$ 20,000.00 |
|  | US$ 110,000.00 |

"Respondent wife however is claiming for additional compensation despite and inspite the settlement concluded on 2 November 2016."

On the part of the respondent, she alleged the following facts, to wit:

"3. Ben was first hired by Complainants on July 14, 1999 and had since then regularly renewed his contract. His last contract with Complainants was as a Waiter on board M/V Norwegian Breakaway for a period of eight (8) months. A copy of Ben's POEA-approved employment contract dated March 14, 2016 was attached as Annex "A" to the Complainant. His employment is also covered by a Collective Bargaining Agreement (CBA), a copy of which is attached as Annex "C" to the Complainant.

"4. Geraldine has been regularly working with Complainants as well. At the time of the tragic incident, Geraldine was also employed as a Restaurant Hostess by Complainant and worked in the same vessel as Ben. As such, she has personally witnessed and experienced the incident which led to the injury and eventual death of her husband.

"5. Ben was part of the Crew Drill and was in the lifeboat. During the drill, the crew inside the lifeboat did not have a safety harness. Neither was there any safety net. In fact, there were no safety mechanism in place. Thus, when the lifeboat's tethering broke, it was left hanging from one wire and the four people in the lifeboat, Ben included, fell into the water. Worse, the lifeboat fell on Ben.

"6. As narrated by Geraldine in her handwritten letter, copy attached as **Annex " 1"**:

"Noong July 20, 2016, 10:00 ng umaga ay nagsimula kami mag perform ng Crew Drill dahil mandatory ito, isang beses sa isang linggo. Ang Mandatory Crew Drill noong araw na iyon ay mas mahaba at mas matagal kumpara sa mga nakaraan at Usual Crew drill naming mga crew. Kadalasan nag-peperform kami ng may 2 o 3 lang na Emergency Code. Pero noong araw ng July 20, 2016 crew drill, ay nag announce ang barko ng halos lahat ng Emergency Code. Sa simula ng Drill, nag-announce sila ng **CODE ALPHA (medical emergency)** ang ibig

3

sabihin. Sumunod ang **Code BRAVO (Fire onboard)** ang ibig sabihin ay may sunog. Pangatlo **CODE DELTA (Damage sa Barko).** Si Ben Buenaventura ang aking asawa ay naka assign sa RESCUE BOAT, ibinaba nila ang rescue boat mula sa Deck 7. Pagkatapos po na mag announce na Clear na ang CODE Delta (Damage), inangat, ipinanik at itinaas na nila ang Rescue boat na may 4 na tao sa loob ng Bangka kasama ang aking asawa na si Ben Buenaventura. Itinaas nila sa 7th Deck ang Bangka na may laman na 4 na tao . Habang nasa itaas ng Deck 7, ang Rescue Boat nag announce ulit ng panibagong emergency code na **CODE PAPA (Pollution).** Kaya kailangan ulit nilang ibaba ang Rescue Boat sa Pangalawang Pagkakataon. At ipinanil ulit sa Deck 7. Ng matapos ang Crew Drill at nag announce na ang Crew Drill ay tapos na, itinaas muli ang rescue boat sa Deck 7 na may 4 na taong nakasakay. Sa makatuwid mahigit ilang beses nilang pinagbaba at itaas ang rescue boat Mula sa Deck 7 pababa sa tubig, at mula sa tubig papanik sa Deck 7 ng may nakasakay na apat na tao sa loob. Madalas kami mag perform ng Crew Drill, madalas din ibinababa ang mga lifeboat at rescue Boat. Ngunit hindi ito madalas napapalitan kaya malamang ang mga kable ng mga Bangka ay marurupok na.

"Ilang minuto lang makalipas ng pag-announce ng crew drill ay tapos na. Nagbalikan na ang mga crew sa kani-kaniyang trabaho. Maya-Maya pa ay nag emergency code ulit ang barko ng **CODE (OSCAR) (man over board)** ibig sabihin ay may nahulog na tao sa tubig. Ako nuon ay nasa aking cabina na, tumawag ako sa aking kasamahan upang alamin kung ang CODE OSCAR ay parte pa din ng aming CREW DRILL? Sabi sa akin ay oo. Part pa din ng crew drill, maya-maya pa, makalipas ang ilang minuto mga pasado 11:30 AM ay may tumawag na sa aking cabina ang aking Restaurant Manager.

"Sinabi sa akin huminga daw ako ng malalalim. Kinabahan na ako at sinabi nga nila sa akin na may EMERGENCY na aking asawa na si BEN M. BUENAVENTURA ay kasama sa aksidente, nahulog ang aking asawa mula sa Deck 7 sa tubig at nadaganan ng Rescue Boat. Nahulog sya mula sa Deck 7. Ikapitong palapag ng Barko. Halintulad sa isang building na may anim na palapag. Napatid ang kable ng Rescue boat habang nasa Deck 7 ito. dahilan upang mahulog ang aking asawa sa tubig.

"Tuluyan ng nakalas ang kable ng Bangka at nahulog ang Rescue Boat sa tubig. Ito ay dumagan sa aking asawa. Nadaganan ng rescue boat ang aking asawa. Tumakbo ako palabas ng barko, akala ng karamihan ng mga crew ay ang nangyari na

4

> CODE OSCAR ay parte pa din ng Crew Drill, hindi nila inakala na ito ay actual na pangyayari, habang nirerescue ang aking asawa ng PRIVATE BOAT akala nila ito ay dummy. Na declare na missing ang aking asawa na si Ben Buenaventura. Sapagka't nagtagal bago sya nakita.
>
> "Ng nakuha na si Ben sa tubig, at dinala sa ambulansya at nandoon ako. Nakakapag-salita pa ang aking asawa at sinasabi na masakit ang kanyang likod, mga binti, at tyan. Isinugod namin sya sa HOSPITAL SA BERMUDA. Bandang Pasado 12:30 na ng hapon nakarating kami sa hospital mga pasado 1:15 pm na. Sa emergency room ay conscious pa sya at nakakapagsalita dahilan upang maikwento nya sa akin ang buong pangayayari sinubukan nyang iligtas ang isa pa nyang kasamahan na si DIOGANES CARPIO ngunit itoy naiwan sa loob ng Rescue Boat, Ng tuluyan ng mapatid ang kable ng RESCUE BOAT. Nahulog na si Ben sa tubig. Isinugod din si Dioganes Carpio ngunit agad itong namatay sa dami ng pinsala sa katawan, ulo at mukha.

"7.   A police report narrating the unfortunate incident issued by the Bermuda Police Service is herein attached as **Annex "2"**.

"8.   Ben was seriously injured and suffered the following injuries:

   i.   Fracture at Scapula
   ii.  Fracture at right arm and elbow
   iii. Blood on his brain
   iv.  Swelling on scalp
   v.   Bruising on his lungs
   vi.  Multiple Fractures on his ribs
   vii. Abdominal bleeding
   viii. Beeding in the liver
   ix.  Blood on the knee
   x.   Both side right and left comminuted fractures on both femur
   xi.  Multiple fracture right and left acetabular and pelvic
   xii. Multiple fractures on spine T-12-L1 to L5

"A Complete report of the injuries sustained by Ben is provided in the Observation Detail Report issued by Bermuda Hospitals Board, attached as **Annex "3"**. Also attached are the previous picture of Ben when he was in the hospital, showing the severity of his condition.

"9.   Ben stayed in the Intensive Care Unit (ICU) of the Bermuda Hospital where surgery was performed on his fractured arm elbow and wrist. On July 24, 2016, he was

5

transferred to Ryder Trauma Jackson Memorial Hospital in Miami, Florida, U.S.A.

"10. He was confined in the Trauma ICU and underwent surgery in his spine but due to the severe injuries suffered, his condition deteriorated until his demise on August 27, 2016 after forty (40) days stay in said hospital.

"11. Geraldine witnessed all these because she was with her husband all the time - from the incident during the crew drill and during Ben's tenure in the hospital. When he was still conscious, Ben described to her how he fell from the rescue boat and the pain he went through in his entire body.

"12. Ben's pain is tantamount to the bleeding heart of Geraldine in losing her husband and more. She was left to care for their five-year old child Brenzid who will never see his father again and cannot teach him how to play basketball. The whole harrowing experience is so traumatic that she sought help of professional psychiatrist and was advised not to work on board any so she will not relive the memories of the unfortunate incident again. Not only did she lose the love of her life, she also lost her job and a promising future for their family.

"13. Justice and fairness demands that Geraldine's agony should be compensated by the irresponsible and heartless Complainants though no amount of money can bring back Ben and complete a happy family again. Geraldine has every right granted by law and equity to sue Complainants for their negligence.

"14. Yet, in a weird twist and a clear sign of Complainant's bad faith, they (Complainants) initiated the instant arbitration proceedings thirteen (13) days after Ben's death, while Geraldine and the rest of the family were still shocked and grieving.

"15. In fact, when the instant notice to arbitrate was filed before this Honorable Office on September 9, 2016, the remains of Ben have not yet even arrived in the Philippines.

"16. There is only one logical explanation for Complainants' act they want to prevent Geraldine from instituting an action arising from their clear gorss negligence.

"17. Indeed, compassion is stranger to Complainants even to its crew who had loyally served them through the years.

6

The parties thereafter submitted their respective replies and rejoinders which reiterated their respective claims and reliefs and other defenses.

After a meticulous and exhaustive review of the arguments of the parties, this Board finds that it has not jurisdiction over the instant complaint and thereby dismisses the same.

In their submission, the following issue was presented for resolution: "To determine the entitlements under the CBA and the POEA and other claims arising from the death of Mr. Ben Buenaventura."

The issue is akin to a declaratory relief which has been defined as an action by any person interested in a deed, will, contract or other written instrument, executive order or resolution, to determine any question of construction or validity arising from the instrument, executive order or regulation, or statute, and for a declaration of his rights and duties thereunder. The only issue that may be raised in such a petition is the question of construction or validity of the provisions in an instrument or statute.[1]

It is settled that the requisites of an action for declaratory relief are: 1] the subject matter of the controversy must be a deed, will, contract or other written instrument, statute, executive order or regulation, or ordinance; 2] the terms of said documents and the validity thereof are doubtful and require judicial construction; 3] there must have been no breach of the documents in question; 4] there must be an actual justiciable controversy or the "ripening seeds" of one between persons whose interests are adverse; 5] the issue must be ripe for judicial determination; and 6] adequate relief is not available through other means or other forms of action or proceeding.[2]

Evidently, the above requisites are not present in this case. For one, the subject matter of controversy – whether it be a document, contract or law – and the terms thereof which are doubtful and require construction have not been clarified. Once clarified, there is a likelihood that there are other

---

[1] Section 1, Rule 63 of Rules of Court
[2] Almeda v. Bathala Marketing Industries, Inc., G.R. No. 150806, January 28, 2008, 542 SCRA 470 cited in Ferrer, Jr., et al. Vs. Mayor Roco, et al., G. R. No. 174129, July 5, 2010

7

remedies already available to the parties, including an action wherein the relief, if proper, may be granted, beyond the bare declaration of their rights and duties.

Furthermore, the Rules provide that action of the adjudicatory body in a case such as this is discretionary. That body, "*motu proprio, x x x* may refuse to exercise the power to declare the rights and to construe instruments in any case where a decision would not terminate the uncertainty or controversy which gave rise to the action, or in any case where the declaration or construction is not necessary and proper under the circumstances." (Sec. 5, Rule 63, Rules of Court). Considering the scope of the pleadings filed by the parties, it is not likely that the case would end with a decision akin to a declaratory relief. That said, we deed it prudent to decline action in this case.

Likewise, such controversy is exclusively vested within the jurisdiction of the Regional Trial Court. This Board will be arrogating unto itself a power that is exclusively vested in another tribunal.

Assuming nonetheless that this Board can exercise jurisdiction on the basis of Article 262 of the Labor Code, as amended, the dispute does not fall within the contemplation of a labor dispute. What is being asked of this Board to rule pertains to tortious conduct of one party that would entitle the other to damages.

It must be noted that the parties both admitted that there was full settlement of claims under the CBA as well as the standard contract of the POEA. What is being sought for clarification is such other claims or entitlement that may arise as a consequence of the purported gross negligence committed that led to the death of Ben Buenaventura. Certainly, such determination cannot be had on mere position papers as the damages, including the claim of failure to exercise the required diligence must be determined by full blown trial with the court having jurisdiction over such quasi-delict. The respective claims cannot be determined by going only through the four corners of the contract as has been admitted in the respective pleadings of the parties that the there was additional claim for payment by reason of the purported negligence.

8

WHEREFORE, premises considered, the complaint filed by **C.F. SHARP CREW MANAGEMENT, INC., and NORWEGIAN CRUISE LINE, LTD.** against **HEIRS OF BEN BUENAVENTURA as represented by GERALDINE BUENAVENTURA** is hereby DISMISSED for lack of jurisdiction.

All other counterclaims are likewise DISMISSED.

SO ORDERED.

This __30th__ day of __January, 2018__, City of Manila

**MVA MANUELA F. LORENZO**
Chairman

**MVA ROSARIO CRUZ**
Member

**MVA GEORGE EDUVALA**
Member

## **ATTESTATION**

I attest that the conclusions in the above Decision had been reached in consultation before the case was assigned to the writer for the opinion of the arbitrators.

**MVA MANUELA F. LORENZO**
Chairman

9